# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CLARE SCHUMACHER : <br> 1439 Aspen Court : <br> West Chester, PA 19380 : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> 470 MANOR OPERATING, LLC d/b/a : <br> ST. MARTHA'S CENTER FOR : <br> REHABILITATION & HEALTHCARE : <br> 470 Manor Avenue : <br> Downingtown, PA 19335 : <br> : <br> Defendant. : <br> : | CIVIL ACTION <br><br> No.: 21-2421 <br><br><br><br> JURY TRIAL DEMANDED |

## FIRST AMENDED CIVIL ACTION COMPLAINT

Clare Schumacher (*hereinafter* referred to as "Plaintiff," unless indicated otherwise) by and through her undersigned counsel, hereby avers as follows:

## INTRODUCTION

1. Plaintiff has initiated this action to redress violations by 470 Manor Operating, LLC d/b/a St. Martha's Center for Rehabilitation & Healthcare (*hereinafter* "Defendant") of Title VII of the Civil Rights Act of 1964 ("Title VII" – 42 U.S.C. §§ 200(d) *et. seq*), the Older Adults Protective Services Act ("OAPSA" - 35 P.S. §§ 10225.101 *et seq.*), and the Pennsylvania Human Relations Act ("PHRA").[1]  As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

---

[1] Plaintiff's claims under the PHRA are referenced herein for notice purposes.  She is required to wait 1 full year before initiating a lawsuit from date of dual-filing with the EEOC.  Plaintiff must however file her lawsuit in advance of same because of the date of issuance of her federal right-to-sue-letter under Title VII.  Plaintiff's PHRA claims however will mirror identically her federal claims under Title VII.

**JURISDICTION AND VENUE**

2. This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws. There lies supplemental jurisdiction over Plaintiff's state-law claims because they arise out of the same common nucleus of operative facts as Plaintiff's federal claims asserted herein.

3. This Court may properly maintain personal jurisdiction over Defendant because its contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington,* 326 U.S. 310 (1945), and its progeny.

4. Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because Defendant is deemed to reside where it is subjected to personal jurisdiction, rendering Defendant a resident of the Eastern District of Pennsylvania.

5. Plaintiff filed a Charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and also dual-filed said charge with the Pennsylvania Human Relations Commission ("PHRC"). Plaintiff has properly exhausted her administrative proceedings before initiating this action by timely filing and dual-filing her Charge with the EEOC and PHRC, and by filing the instant lawsuit within 90 days of receiving her right-to-sue letter from the EEOC.

**PARTIES**

6. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7. Plaintiff is an adult individual with an address set forth in the caption.

8. 470 Manor Operating, LLC d/b/a St. Martha's Center for Rehabilitation and Healthcare is a Catholic faith care center that provides short- and long-term rehabilitation and care programs to its residents, with an address set forth in the above-caption. Plaintiff was hired from and worked out of this address.

9. At all times relevant herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for the Defendant.

## FACTUAL BACKGROUND

10. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11. Plaintiff is an adult female.

12. Plaintiff was employed by Defendant as a Registered Nurse ("RN") Unit Manager for approximately 9 months, from on or about January 14, 2020, until her unlawful termination (discussed further *infra*) on or about October 22, 2020.

13. Plaintiff worked well over 40 hours per week for Defendant, and reported primarily to RN Director of Nursing ("DON"), Karen Cassidy (*hereinafter* "Cassidy"). Plaintiff had also indirectly reported to Executive Director, Jen Quinones (*hereinafter* "Quinones") and Regional Management, Ed (last name unknown, *hereinafter* "Ed").

14. Throughout her employment with Defendant, Plaintiff was a hard-working employee who performed her job well.

15. Upon Plaintiff's observations and belief, Defendant is run very haphazardly, with poor management and organization, and in continual violation of policies and regulatory obligations.

16. For example, during her tenure with Defendant, Plaintiff was repeatedly and routinely subjected to unwelcomed sexual comments/conduct by a housekeeping employee, Raymond Williams (*hereinafter* "Williams"). By way of specific example, but not intended to be an exhaustive list, Williams:

   a. Followed Plaintiff around despite not needing to be in the same areas that Plaintiff was working;

   b. Stood too close to Plaintiff and touched her shoulder on multiple occasions;

   c. Obsessively watched Plaintiff's movements, regularly waiting for her wherever she was working;

   d. Routinely asked other employees about Plaintiff's whereabouts;

   e. Subjected Plaintiff to verbally sexual and inappropriate comments, such as telling Plaintiff he wanted "to run away with [her]" and "be with [her]"; and

   f. Regularly blocked the one entrance/exit that Plaintiff utilized to leave the facility with his mop, laughing at her and not allowing her to leave for brief periods. Plaintiff discovered that she was not the only female employee that Williams subjected to this harassing behavior (i.e., when she commented at a weekly Care Conference that she was sick of Williams constantly blocking her when she leaves the facility, virtually every other woman in the meeting replied "me too.")

17. Throughout her tenure with Defendant, Plaintiff tried her best to either ignore Williams' aforementioned unwanted harassment or indicate through her actions and body language that she was uncomfortable with Williams' sexual advances/comments/touching. However, the sexual harassment became so pervasive that Plaintiff had to cease working for the remainder of one day.

18. Because Williams' aforesaid sexual harassment began to interfere with Plaintiff's work, she was forced to complain to multiple levels of Defendant's management of said sexual harassment and seek significant intervention in advance of her termination.

19. Plaintiff initially expressed her sexual harassment concerns to Defendant's management in the July 2020 timeframe. However, by early August of 2020, Plaintiff had no choice but to escalate her complaints because she had been scheduled to work in the presence of Williams in a different area of the building. As a result, Plaintiff requested that Williams work away from her and refrain from speaking to her.

20. Instead of meaningfully investigating or addressing Plaintiff's aforesaid complaints of sexual harassment, Plaintiff was subjected to pretextual admonishment and written discipline in or about by October of 2020.

21. Thereafter, Plaintiff was abruptly terminated on or about October 22, 2020, for alleged "poor performance."

22. Defendant's purported reason for her termination – "poor performance" – however, is completely pretextual and clearly motivated by Plaintiff's objections to sexual harassment and continued requests to resolve sexual harassment.

23. Additionally, even though Defendant's management knew Williams had sexually harassed Plaintiff (which upon information and belief is a terminable offense as Defendant had a zero-tolerance policy for sexual harassment), they did not take any meaningful remedial action to correct his behavior, and he remained employed with Defendant following Plaintiff's termination.

24. Plaintiff believes and therefore avers that she was really subjected to a hostile work environment and terminated because of her gender and/or complaints of sexual harassment/hostile work environment (as discussed *supra*).

-**<u>Violations of the Older Adult Protective Services Act</u>**-

25. In addition to reports of sexual harassment, leading up to her termination, Plaintiff reported multiple instances of neglect and/or abuse to Defendant's management, pertaining to several patients, who, upon information and belief, were 60 years of age or older. By way of example, but not intended to be an exhaustive list:

   a. Plaintiff discovered after returning to work one Monday, that an elderly patient (*hereinafter* referred to as "Patient A") [2] had fallen on multiple occasions over the weekend, followed by her fourth fall that Monday, during which Patient A hit her head. Plaintiff reported the neglect and/or abuse of Patient A to DON Cassidy, inquiring as to why Patient A had not been sent to the hospital over the weekend, as the patient was on blood thinners and at risk of severe harm from the falls. Cassidy hostilely advised Plaintiff that "no one would be sending [Patient A] out," to which Plaintiff replied that they had an obligation to send Patient A for an evaluation. Plaintiff then contacted Patient A's doctor who had her transported to Brandywine Hospital, after which she was evaluated and airlifted to a trauma center in Reading Pennsylvania for a brain bleed. Instead of commending Plaintiff for protecting the well-being of Patient A, Cassidy admonished and reported Plaintiff to Quinones for harming Defendant's reputation;

   b. On a separate occasion in or about September 2020, Plaintiff went to assess another elderly patient (*hereinafter* referred to as "Patient B"), who screamed painfully when Plaintiff touched her hand. Plaintiff requested an x-ray of Patient B's hand, which revealed a very bad fracture. Following the x-ray, Plaintiff discovered that

---

[2] Patients herein are referenced only as Patients A, B, and C for privacy purposes.

6

      Patient B's hand injury had been brought to the attention of several people, including Cassidy, who had ignored Patient B's complaints. When Plaintiff reported to Cassidy that ignoring Patient B's fractured hand amounted to neglect, Cassidy refused to believe that Patient B's hand was actually fractured and required a second x-ray. Following the second x-ray, Plaintiff complained to Defendant's Medical Director, who confirmed to Plaintiff that Patient B's fracture was of the kind that could have resulted in amputation if left untreated; and

  c. Plaintiff discovered that Defendant's management, including but not limited to Cassidy, failed to assess another elderly patient (*hereinafter* referred to as "Patient C"), despite multiple requests from Patient C's social worker. As a result, when Patient C was eventually assessed, she was near death, immediately transferred to a local hospital, and spent over 5 weeks in recovery;

26. Plaintiff reported each of the aforementioned (and other) instances of patient neglect and/or abuse to multiple levels of management, including but not limited to Cassidy and Quinones, always following the proper chain of command.

27. Plaintiff advised Cassidy that the referenced incidents of neglect and/or abuse needed to be reported to the proper agency, however Cassidy responded with hostility and animosity. Specifically, Cassidy acted aggressively towards Plaintiff and constantly nitpicked and scrutinized her performance, including threatening her with discipline in order to intimidate Plaintiff from reporting her concerns to the appropriate agency.

28. Before Plaintiff had the opportunity to see whether Defendant's administration was going to report such aforementioned neglect and/or abuse to the proper agency or whether an investigation into such acts of neglect and/or abuse would be properly conducted by Defendant's

administration, Plaintiff was abruptly terminated on or about October 22, 2020, for alleged "poor performance."

29. Defendant's purported reason for her termination – "poor performance" – however, is completely pretextual and clearly motivated by Plaintiff's non-cooperation or objection to patient abuse and neglect (inclusive of sending patients to hospitals where medically necessary).

30. Plaintiff believes and therefore avers that she was really terminated for advising Defendant's management of the aforementioned acts of neglect and/or abuse and so that Defendant could intimidate her from further reporting the aforementioned acts of neglect and/or abuse to an appropriate outside agency.

## COUNT I
## Violations of Title VII
([1] Gender Discrimination; [2] Sexual Harassment/Hostile Work Environment; and [3] Retaliation)

31. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

32. During her tenure with Defendant, Plaintiff was subjected to severe and/or pervasive sexual advances, comments, and conduct by a male co-worker such that she was subjected to a hostile work environment.

33. The male co-worker's harassment of Plaintiff interfered with Plaintiff's work and as a result she was forced to complain of said sexual harassment to Defendant's management, in advance of her termination.

34. In response to Plaintiff's complaints of sexual harassment, Williams continued to subject Plaintiff to unwelcomed sexual comments/conduct, and Defendant's management subjected Plaintiff to pretextual admonishment and written discipline.

35. On or about October 22, 2020, Plaintiff was abruptly terminated in close proximity to her complaints of sexual harassment, for pretextual reasons.

36. Plaintiff believes and therefore avers that she was subjected to a hostile work environment and terminated because of her gender and/or in retaliation for her complaints of sexual harassment (as discussed *supra*).

37. These actions as aforesaid constitute unlawful violations under Title VII.

## COUNT II
## Violations of the Older Adults Protective Services Act
## (35 P.S. §§ 10225.101 *et seq.*)
### (Intimidation)

38. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

39. Plaintiff was an employee of Defendant, a "facility" or facilities under the Older Adult Protective Services Act 35 P.S. § 10225.103, as this term has been defined.

40. 35 P.S. § 10225.302 states that "[a]ny person having reasonable cause to believe that an older adult is in need of protective services may report such information to the agency which is the local provider of protective services. . ."

41. Leading up to her termination, Plaintiff reported multiple instances of neglect and/or abuse to her supervisor (Cassidy), pertaining to several older patients, who, upon information and belief, were 60 years of age or older, with functional limitations and therefore needed the assistance of another person to perform or obtain services necessary to maintain their physical or mental health.

42. Before Plaintiff had the opportunity to see whether Defendant's administration was going to report such aforementioned neglect and/or abuse to the proper agency or whether an

investigation into such acts of neglect and/or abuse would be properly conducted by Defendant's administration, Plaintiff was abruptly terminated.

43. Plaintiff, unlike her fellow employees who failed to report neglect and/or abuse within Defendant and/or who actually committed neglect and/or abuse, was terminated from her employment with Defendant for completely pretextual reasons.

44. Plaintiff was subjected to verbal admonishment, discipline, and termination by Defendant as a way to intimidate her from further reporting such acts of abuse to an appropriate outside agency.

45. 35 P.S. §§ 10225.302(c.1) (a subsection of 35 P.S. § 10225.302(c)) further states that "[a]ny person . . . with knowledge sufficient to justify making a report or cooperating with the agency . . . shall be free from any intimidation by an employer or by any other person or entity. Any person who violates this subsection is subject to civil lawsuit by the person intimidated . . . wherein the person intimidated . . . shall recover treble compensatory and punitive damages . . . ."

46. Defendants violated 35 P.S. §§ 10225.302(c.1) because they intentionally intimidated Plaintiff by hostilely admonishing, disciplining, and ultimately terminating Plaintiff because she had knowledge that Defendant's employees engaged in neglect and/or abuse against patients of Defendant (which would have been sufficient to justify her making a report to an appropriate outside agency on aging).

47. As a consequence of Defendant's violations of the Older Adult Protective Services Act, Plaintiff has suffered damages.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendant is to promulgate and adhere to a policy prohibiting discrimination and retaliation in the future against any employee(s);

B. Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement and seniority;

C. Plaintiff is to be awarded punitive damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

D. Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper and appropriate (including but not limited to damages for emotional distress, pain, suffering and humiliation);

E. Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law; and

F. Plaintiff demands trial by jury on all issues so triable consistent with Fed. R. Civ. P. 38(a)(1).

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: */s/ Andrew R. Olcese*
   Timothy S. Seiler. Esq.
   Andrew R. Olcese, Esq.
   3331 Street Rd.
   Two Greenwood Square, Suite 128
   Bensalem, PA 19020
   (215) 639-0801

Dated:  August 9, 2021